IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NOVEL AUSTIN, JR.,
     Petitioner,

vs.                          Case No.:  3:19cv331/LAC/EMT

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Novel Austin, Jr. ("Austin") filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent ("the State") filed an answer and relevant portions of the state court record (ECF No. 16).  The court provided Austin an opportunity to file a reply (*see* ECF No. 17), but he has not done so.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the

court show that Austin is not entitled to relief.

I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 16).[1]  On January 10, 2012, a grand jury in

the Circuit Court in and for Escambia County, Florida, Case No. 2011-CF-6167,

returned an indictment charging Austin with one count of first-degree murder with

a firearm (Count 1) and one count of attempted first-degree murder with a firearm

(Count 2) (Ex. B1 at 1–2).  The victims were Keondrick Abrams and Tykey Douglas,

respectively.   On February 12, 2013, Austin was charged by information with

additional counts of third-degree felony murder with a firearm (Count 3) and

attempted third degree felony murder with a firearm (Count 4) as to the same victims

(*id.* at 3).  Following a jury trial on February 18–20, 2013, Austin was found guilty

as charged (Ex. B1 at 49–51, Ex. B2, B3, B4, B5).  On February 20, 2013, the trial

court adjudicated Austin guilty of Counts 1 and 2 and sentenced him to concurrent

terms of life in prison, with pre-sentence jail credit of 421 days (Ex. B1 at 57–65).

---

[1] Citations to the state court record refer to the exhibits submitted with the State's answer (ECF No. 16).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

The court determined that sentences on Counts 3 and 4 were barred by double jeopardy (Ex. B1 at 67–68, Ex. B6).

Austin, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D13-1122 (Ex. B7).   Austin's counsel filed a brief, pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting there were no meritorious arguments to support the contention that reversible error occurred in the trial court (Ex. B7).   The appellate court provided Austin an opportunity to file a pro se initial brief (*see* Ex. B9), but he did not do so.   On December 20, 2013, the First DCA affirmed the judgment per curiam without written opinion (Ex. B10).   *Austin v. State*, 128 So. 3d 798 (Fla. 1st DCA 2013) (Table). The mandate issued January 15, 2014 (Ex. B11).

On January 6, 2014, Austin filed a petition for writ of habeas corpus in the First DCA, Case No. 1D14-,0128 alleging ineffective assistance of appellate counsel (Ex. C1).   The First DCA denied the petition on the merits on February 6, 2014 (Ex. C2).   *Austin v. State*, 132 So. 3d 360 (Fla. 1st DCA 2014) (Mem).

On October 27, 2014, Austin filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. D1 at 7–24).   Austin subsequently amended the motion with two additional claims (*id.* at 76–79, 108–12).   On March 24, 2016, the circuit court held a limited

evidentiary hearing on one of Austin's seven claims (*see* Ex. D1 at 92–93, Ex. D4). The court denied the Rule 3.850 motion in an ordered rendered on April 27, 2016 (Ex. D2 at 118–30). Austin appealed the decision to the First DCA, Case No. 1D16-2565 (Ex. D5). The First DCA affirmed the circuit court's decision per curiam without written opinion on April 19, 2017 (Ex. D8). *Austin v. State*, 225 So. 3d 801 (Fla. 1st DCA 2017) (Table). The mandate issued July 5, 2017 (Ex. D12).

On May 16, 2016, Austin filed another Rule 3.850 motion in the state circuit court, alleging newly discovered evidence (Ex. E3 at 445–53). He subsequently amended the motion (Ex. E6). The circuit court appointed counsel for Austin and held an evidentiary hearing (Exs. E7, E8, E9, E10). The court denied the amended Rule 3.850 motion in an order rendered on August 6, 2018 (Ex. E11). Austin filed a notice of appeal, First DCA Case No. 1D18- 3782 (Ex. E12). On March 27, 2019, the First DCA dismissed the appeal for Austin's failure to comply with the court's order directing him to file an initial brief (Exs. E4, E5).

Petitioner filed the instant federal habeas action on January 31, 2019 (ECF No. 1).

## II.   STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254. Section 2254(d) provides, in relevant part:

**(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> **(2)**    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas

petition upon which there has been an adjudication on the merits in a state court

proceeding, the federal court must first ascertain the "clearly established Federal

law," namely, "the governing legal principle or principles set forth by the Supreme

Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538

U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly

established" only when a Supreme Court holding at the time of the state court

decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47,

130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, 575 U.S. 312, 316,

135 S. Ct. 1372, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly

established Federal law for purposes of § 2254(d)(1) includes only the holdings, as

opposed to the dicta, of this Court's decisions." (internal quotation marks and

citation omitted)).

After identifying the governing legal principle(s), the federal court determines

whether the state court adjudication is contrary to the clearly established Supreme

Court case law. The adjudication is not contrary to Supreme Court precedent merely

because the state court fails to cite to that precedent. Rather, the adjudication is

"contrary" only if either the reasoning or the result contradicts the relevant Supreme

Court cases. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263

(2002). Where there is no Supreme Court precedent on point, the state court's

conclusion cannot be contrary to clearly established federal law. *See Woods*, 575

U.S. Ct. at 317 (holding, as to claim that counsel was per se ineffective in being

absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 575 U.S. at 316 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2).    The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).    As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").    Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance."    *Brumfield v. Cain*, 576 U.S. 305, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim.  *See Panetti*, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be."  *Richter*, 562 U.S. at 102.

## III.   RELEVANT TRIAL EVIDENCE

The shooting of Keondrick Abrams and Tykey Douglas occurred during a drug deal on Saturday, December 17, 2011.  Jack Woodul testified he was leaving work at Baptist Hospital between 7:00–7:30 p.m. when he saw a white, older model Tahoe or Suburban SUV pull out of the Baptist Sleep Center parking lot at a high

rate of speed (Ex. B2 at 181–85). Woodul testified he thought it was odd, because the Sleep Center was closed on weekends, so he went to the parking lot. Mr. Woodul testified he saw a car in the parking lot. Woodul testified the driver's side door was open, and someone was lying outside the car. Mr. Woodul testified he rode his bike toward the car, and the man raised his head and looked like he was attempting to crawl back into the car. Woodul testified the light was on in the car, and he could see that the man's head was "messed up pretty bad," and he was gurgling to breathe. Mr. Woodul testified he told the man to stay still, and he went back to the Hospital and summoned a security guard.

John Helms testified he was a security guard at Baptist Hospital on December 17, 2011 (Ex. B2 at 189–93). Helms testified that at approximately 7:15 p.m., he approached the vehicle in the Sleep Center parking lot and saw two black males seated in the car, one in the driver's seat and the other in the passenger's seat. Mr. Helms testified the driver was mumbling, and the passenger was quiet and not moving. Helms testified he called 911, and EMT and law enforcement arrived.

Sergeant Christman of the Pensacola Police Department ("PPD") testified he arrived at the scene (Ex. B2 at 195–98). Christman testified the driver was semi-conscious and transported to Baptist Hospital. He testified the passenger was

pronounced deceased.  Sergeant Christman testified the driver was identified as Tykey Douglas, and the passenger was identified as Keondrick Abrams.

Akeiya Mitchell testified both Tykey Douglas and Keondrick Abrams were her cousins (Ex. B3 at 212–17).  She testified Tykey's nickname was "Dunk" and Keondrick's was "Daddy."  Ms. Mitchell testified she also knew James Dortch (Austin's co-defendant) and Austin.  She testified Austin's nickname was "Doodoo" and Dortch's was "Whoop."  Ms. Mitchell testified that between 3:30–4:00 p.m. on December 17, 2011, James Dortch gave her a ride in a white Yukon from Attucks Court to Montclair.  She testified Shaquille Rogers, known as "Chopper," was also in the vehicle.  Ms. Mitchell testified during the ride, Dortch and Rogers discussed that they wanted to rob someone.

Brian Brock testified he was a PPD officer in December of 2011 (Ex. B3 at 234–36).  Brock testified he participated in a traffic stop of a white Yukon on December 19, 2011, two days after the shooting.  Brock testified the driver of the vehicle was Truna Dortch, and the vehicle was impounded to the police station.

Justin Cooper testified he was a crime scene analyst with the PPD (Ex. B3 at 238–50).  He testified he arrived at the scene of the shooting at 7:35 p.m. on December 17, 2011.  Cooper testified he saw several items at the scene, including a box of sandwich bags, a small plastic bag with suspected marijuana, and a $10 bill

on the ground on the driver's side of the vehicle. Mr. Cooper testified he searched Keondrick Abrams' pockets and found a small bag of suspected cocaine and $647.75 cash. Cooper testified he also found a cellphone and lanyard around Abrams' neck. Cooper testified he also searched Tykey Douglas' clothing and found a $5 bill, a plastic bag, and $106.16 cash. Mr. Cooper testified he analyzed the white Yukon after it was impounded. He testified he saw suspected blood on the exterior and interior of the passenger front door and suspected blood on the driver's side rear door close to the front door. Cooper testified he swabbed each area with a sterile Q-tip and turned the samples into evidence. He testified he also photographed the areas.

Trevor Seifert testified he was a lab analyst in the Biology section of the Florida Department of Law Enforcement ("FDLE") (Ex. B3 a 255–64, 281–82). Seifert testified he compared the DNA profiles of the blood samples collected from the white Yukon with DNA samples from Tykey Douglas and Keondrick Abrams. Seifert testified the swabbing from each area of the vehicle demonstrated the presence of at least two individuals. He testified the DNA profile for the "major contributor" from all of the samples matched the DNA profile of Tykey Douglas. Mr. Seifert testified James Dortch was excluded as a contributor to any of the blood on the vehicle. He testified Austin was excluded as a contributor to the blood samples from the front passenger door.

Dr. Charles Chapleau testified he treated Tykey Douglas for the bullet wound to his head (Ex. B3 at 270–79).  Dr. Chapleau testified during the surgery, he removed a blood clot, damaged brain matter, bone fragments, and smaller bullet fragments.  Dr. Chapleau testified Douglas also had a fresh laceration on the back of his head.  Dr. Chapleau opined that the bullet entered near Douglas' right ear hole, traveled down the skull and hit the base of the skull, then bounced inside the skull and lodged in the middle of the top of his head.  Dr. Chapleau testified Douglas was in the hospital for 12 days.  He testified Douglas was off the ventilator in 3 or 4 days and talking and following commands.   Dr. Chapleau testified Tykey Douglas was discharged with partial significant paralysis of his left arm and leg.  He testified Douglas' toxicology report noted he tested positive for the presence of benzodiazepines and cannabinoids.

James Reese, an investigator with the PPD, testified he interviewed Tykey Douglas twice at the hospital (Ex. B3 at 283–311).  Reese testified the first interview was December 21, 2011, four days after the shooting.  Reese testified Douglas first stated that "Tevo" shot him, and Douglas also mentioned "Whoop."  Investigator Reese was familiar with Tevin Fountain, known as "Tevo," and he knew that Tevo was deceased at the time of the shooting.  Reese testified he talked to Tykey Douglas again on December 27, 2011, and Douglas' physical condition was "a lot better."

Reese testified Douglas could sit up, and his speech and cognitive skills had improved. Investigator Reese testified Douglas stated that Austin shot him, and James Dortch was with Austin. Douglas told Reese that "Chopper" was not there. Reese testified Mr. Douglas was interviewed by another PPD detective between December 21 and December 27.

Investigator Reese testified he interviewed James Dortch after he interviewed Tykey Douglas (Ex. B3 at 283–311). Reese testified Dortch first stated he was not involved and did not know anything about the shooting. Reese testified that when he told Dortch that blood from the white Yukon matched one of the victims, Dortch told a different story. Dortch stated he went to Baptist Hospital to buy some marijuana from Tykey Douglas. Dortch stated he arranged the meeting through a phone call. Dortch stated his own cellphone number was 850-530-7938. Dortch stated he drove alone to the Hospital in his mother's white SUV. Dortch stated when he arrived, he saw Tykey Douglas on the ground and Keondrick Abrams in the car. Dortch stated he touched Douglas, decided that "something bad had happened," and left.

Detective Jonathan Thacker testified he interviewed Tykey Douglas on December 22, 2011 (Ex. B3 at 312–16). Thacker testified Douglas was tired and groggy but able to speak. Thacker testified Douglas stated that Novel Austin, known

as "Doodoo," shot him. Douglas told Thacker that "Whoop" was with Austin. Detective Thacker testified he interviewed Mr. Douglas again on December 29, 2011, and Douglas again told him that Austin shot him, and "Whoop" was with Austin. Douglas told Thacker that "Chopper" was in the SUV Austin and "Whoop" arrived in. Detective Thacker testified he arrested Austin on December 28, 2011. He testified he confiscated a cellphone from Austin and provided it to Investigator Jeff Brown.

Detective Thacker testified that shortly after the shooting he also interviewed Naomi Sealey (Ex. B3 at 321–25). Thacker testified Ms. Sealey told him she had been with Austin the day of the shooting. Thacker testified Ms. Sealey had her cellphone with her during the interview and showed it to him. Thacker testified the cellphone indicated that Austin spoke to her for 2 minutes at 6:18 p.m. on the day of the shooting. Detective Thacker testified he viewed video surveillance from a McDonald's restaurant approximately 2 miles from Baptist Hospital. He testified the video showed Austin, Ms. Sealey, and another male at the restaurant at 8:55 p.m. Thacker testified the other male was not Mr. Dortch.

Officer Jeff Brown testified he was provided with Austin's cellphone (Ex. B3 at 329–32). Brown testified he used a Cellbright device to retrieve the Contacts, call logs, and text messages from Austin's cellphone and create a report. The report was

admitted into evidence as State's Exhibit 28 (*see* Ex. B1 at 117–37). Brown testified

the PPD also obtained phone records from a cellphone company, including records

from Tykey Douglas' phone and James Dortch's phone. Officer Brown testified he

did not review those phone records to determine if there were any incoming calls

from Austin or outgoing calls to Austin.

Tykey Douglas testified he went to elementary school with Austin, and he had

known James Dortch for years from playing sports (Ex. B3 at 333–53, 360–64).

Douglas identified both men in the courtroom. He testified Austin was known as

"Doodoo," and Dortch was known as "Whoop." Mr. Douglas testified he also knew

Shaquille Rogers or "Chop" from sports, and he knew Keondrick Abrams or "Little

Dad" as a childhood friend. Douglas testified his own nickname was "Dunk."

Douglas testified he and Abrams were drug dealers in December of 2011. Douglas

testified he talked to James Dortch on December 17, 2011, and Dortch wanted to

buy an ounce and a half of marijuana for $130–150. Douglas testified he also spoke

to Austin that day, and Austin wanted to buy the same amount of marijuana. Douglas

testified he agreed to meet Austin and Dortch, separately, at Baptist Hospital.

Douglas testified he drove a gold Buick Le Sabre to the parking lot of the Baptist

Sleep Center, and Keondrick Abrams was his passenger. Douglas testified he had 4

ounces of marijuana with him, which was enough to fill a small plastic sandwich

bag.  Douglas testified he had over $1,000 cash in his pocket.  Douglas testified Austin, Dortch, and Shaquille Rogers pulled up in a white SUV approximately 2–3 minutes after he had spoken with both Dortch and Austin.  Douglas testified he did not expect Dortch and Austin to arrive together.  Douglas testified Rogers was driving the SUV, and Dortch came out of the back of the vehicle.  Douglas testified Austin and Dortch got in Douglas' car.  Austin sat behind Douglas, and Dortch sat "behind in the back."  Douglas testified he saw Shaquille Rogers get out of the SUV, look into Douglas' car, and walk past it.  Douglas testified he weighed some marijuana on a digital scale, showed the amount to Dortch, and exchanged the marijuana for $135 with Dortch.  Douglas testified after Dortch handed him the money, Douglas took out the rest of his money, folded Dortch's money on top, and put it all back in his pocket.  Douglas testified he did not sell anything to Austin, but Austin asked him if he had more marijuana, and Douglas responded that he would have to go get it.  Douglas testified he was looking at Austin in the rearview mirror as they talked.  Douglas testified, "I asked him like [sic] what you want [sic] and turned around and bam."  Douglas testified Austin shot him.  He testified just prior to being shot, he saw a gun in Austin's lap positioned "as if he were fixing [sic] to hand me something."  Douglas testified he never saw Dortch with a gun.  Douglas testified after he was shot, he tried to start the car, but it would not start.  He testified

he then pushed the driver's door open and as he was trying to get out, Dortch started beating him. Douglas testified Dortch continued to beat him until Douglas got himself out of the car. Douglas testified he tried to walk to the hospital but was paralyzed on his left side. He testified he did not see where Austin and Dortch went. Douglas testified he screamed and rolled back and forth trying to get someone's attention. Douglas testified he then drug himself back into the car, said a prayer, leaned his seat back, closed his eyes, and blacked out.

Tykey Douglas admitted he initially told police that "Tevo" shot him, and he admitted he told Investigator Reese at least 20 times that Tevo shot him (Ex. B3 at 354–56, 365–66). He testified Tevo did not shoot him but had been buried the day of the shooting. Douglas testified he said the name "Tevo" because Tevo and Austin were both from downtown, were the same height, had the same complexion, and wore their hair in dreadlocks. Douglas testified he was shown two photo line-ups and chose one photo from each line-up—one was Austin's and the other was Dortch's. Douglas admitted he initially lied to police when he told them he drove a black Nissan the night of the shooting, and later told investigators he was driving a gold/tan Buick he "rented" in exchange for crack cocaine from a man named Doss. Douglas testified his cellphone was with him on the night of the shooting, and his number was 850-607-4829.

Austin's counsel questioned Mr. Douglas about his phone contact with Austin on the day of the shooting (Ex. B3 at 376–77). Douglas testified he called Austin's cellphone several times that day and left a message. He testified he did not "get through" to Austin's phone until later in the day. Douglas testified phone records would show this. Douglas' phone records were admitted into evidence as State's Exhibit 29 (Ex. B1 at 138–44. Ex. B4 at 458). The records did not show any phone calls between Douglas' number and Austin's number (850-356-6750) on December 17, 2011 (Ex. B1 at 138–44). But the records showed numerous phone calls between Douglas' number and James Dortch's number (530-7938). At 6:29 p.m., Dortch's phone called Douglas' phone and the call lasted 58 seconds. At 6:44 p.m., Douglas' phone called Dortch's phone and the call lasted 26 seconds. At 6:55 p.m., Dortch's phone called Douglas' phone and the call lasted 55 seconds. At 6:58 p.m., Douglas' phone called Dortch's phone and the call lasted 38 seconds. At 6:59 p.m., Douglas' phone called Dortch's phone and the call lasted 10 seconds. This was the last call Douglas made that day. After that, all incoming calls went to Douglas' voicemail.

James Dortch's defense counsel presented testimony from Shaquille Rogers, who was also known as "Chopper" (Ex. B4 at 472–75, 519–21). Rogers testified he was with James Dortch and Akeiya Mitchell during the 10-minute drive from

Attucks Court to Montclair on December 17, 2011. Rogers testified he never heard

Dortch ask Mitchell if she knew anyone who had money.

Austin's defense counsel presented testimony from Naomi Sealey (Ex. B4 at

524–37). Ms. Sealey testified she spoke to Austin at 6:18 p.m. on December 17,

2011. She testified Austin agreed to pick her up and give her and Tyree Sims a ride

downtown, and she told Austin her address. Ms. Sealey testified approximately 45

minutes to an hour later, Austin picked her up in a white Buick car. She testified

they went to a gas station, picked up Tyree, drove to Warrington, and ended up at

McDonald's between 8:50 and 9:00 p.m. Ms. Sealey testified it took approximately

10–15 minutes for a person to drive from Baptist Hospital to her address. On cross-

examination, Ms. Sealey admitted she told an investigator several times that Austin

picked her up at "seven going on eight." Sealey also testified that James Dortch was

not with them at McDonald's.

## IV.    AUSTIN'S CLAIMS

**A.    Ground One: "Victim and only eyewitness to the crime was shot in the head, lost copious blood, went into a coma, went into surgery, and named multiple people as the shooter prior to identifying Petitioner. Counsel still did not consider highering [sic] a medical expert, even after Defendant asked him to."**

Austin provides no additional factual basis for this claim (*see* ECF No. 1 at 5). He states he presented this claim to the state courts in his Rule 3.850 motion and appeal of the circuit court's decision to the First DCA (*id.* at 5–6).

The State concedes this claim appears to be exhausted (ECF No. 16 at 9–10). The State contends the state courts adjudicated the merits of the claim, and Austin has not demonstrated that the adjudication was contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable factual determination (*id.* at 21–26).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under *Strickland*, Austin must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Austin fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and reasonableness is measured "under prevailing professional norms." *Strickland*, 466

U.S. at 688. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable

lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the *Strickland* standard, Austin's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Austin must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Austin must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice

assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

## 2.    Federal Review of State Court Decision

Austin presented this claim as Ground I of his Rule 3.850 motion (Ex. D1 at 9–13).  Austin alleged he told defense counsel to hire a medical expert to explain the effect of the impact of the bullet on Tykey Douglas' memory.  Austin alleged a medical expert could have explained how the effects of a combination of being shot in the head, placed on medications, and being in a "heavily sedated coma" could have affected Mr. Douglas' ability to remember who shot him.  Austin alleged the jury would have returned a not guilty verdict if defense counsel had presented this testimony from a medical expert.

In the state circuit court's written decision denying the claim, the court correctly stated the deficient performance and prejudice prongs of the *Strickland* standard as the applicable legal standard (Ex. D2 at 119–20).  The court adjudicated Ground I as follows:

> In his first claim, Defendant asserts that his trial counsel was ineffective for failing to call a medical expert to "explain to the jury how the impact from the victim's head injury and being in a prolonged drug-induced coma would have affected the victim's memory to identify the defendant."  Defendant asserts that prior to his trial, he asked his attorney to hire such an expert to explain the impact of the victim's head wound on his memory.  He points to the fact that the surviving victim initially identified "Tevo" (a deceased acquaintance) as his assailant, and that at one point also named "Chopper" (another individual known as Shaquille Rogers) as the assailant.  Had an expert been called, Defendant asserts that "the veracity of the victim's identification of the Defendant as the shooter would have been undermined and called into question and shown to be dubious."

Defendant has failed to show an entitlement to relief.  First, he asserts that he asked his counsel prior to trial to hire a medical expert, and he failed to do so.  However, Defendant was asked at the conclusion of the trial, "Was there any evidence that you wanted your attorney to present that he did not present?"  Defendant responded, "No, sir." Therefore, his claim that he wished to have an expert called is refuted by his statement at trial.  *See Terrell v. State*, 9 So. 3d 1284 (Fla. 4th DCA 2009) (holding that claim that counsel failed to call witnesses was refuted where defendant was aware of the substance of the witness's testimony before trial and the colloquy showed that defendant did not want to call any more witnesses).

Secondly, even were this not the case, Defendant has failed to demonstrate prejudice.  It is unclear precisely to what information a medical expert might have testified.  The jury was clearly aware that the victim had been shot at close range in the head, that he had received extensive medical treatment, and that he had tested positive for drugs in his urine at the time of his medical treatment.  Further, both the detectives that interviewed him and the victim himself (Tykey Douglas) acknowledged that he had initially identified other individuals as the shooter.  However, Mr. Douglas also stated that he had known Defendant since elementary school, that he was much closer to Defendant than he was to the co-defendant, James Dortch, and that they were friends who had rapped together.  Mr. Douglas also explained to the jury why he initially said that "Tevo" shot him.  Additionally, he was able to pick Defendant and his co-defendant out of a line-up.  Even if this claim were not refuted by the record, Defendant cannot show that the speculative testimony of a medical expert would have rendered a different result at his trial, and he is not entitled to relief on this basis.

(Ex. D2 at 121–22) (footnote citations to trial transcript omitted).  The First DCA

affirmed the circuit court's decision without written opinion (Ex. D8).

Where, as here, there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment, federal habeas courts employ the following "look through" presumption: "[T]he federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018).

"Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [a federal habeas court] will seldom, if ever, second guess." *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) (quotation marks and citation omitted). Further, speculation regarding the testimony of missing witnesses is "insufficient to carry the burden of a habeas corpus petitioner." *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001); *see also Sullivan v. DeLoach*, 459 F.3d 1097, 1108–09 (11th Cir. 2006) (holding that where a petitioner raises an ineffective assistance claim based on counsel's failure to call a witness, the petitioner carries a heavy burden to show prejudice "because often allegations of what a witness would have testified to are largely speculative." (quotation marks and citation omitted)); *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints of uncalled witnesses are not favored, because

the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.").[2] "[T]he mere fact a defendant can find, years after the fact, [an] . . . expert who will testify favorably for him does not demonstrate that counsel was ineffective for failing to produce that expert at trial." *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) (counsel was not ineffective for failing to call a mental health expert to testify). This is especially true when reviewing a state court's finding that counsel was not ineffective for failing to call such an expert to testify. *See Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1262–63 (11th Cir. 2011) (emphasizing the deference afforded the state court in determining whether counsel was deficient in failing to call a particular expert).

Applying *Wilson*'s look-through presumption, the state court's rejection of Austin's claim was based on a reasonable determination of the facts and a reasonable application of *Strickland*. Austin did not proffer any evidence, in the form of an affidavit or otherwise, that a medical expert would have testified as Austin suggests. The state court reasonably determined that it was "unclear" what the content of a

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

medical expert's trial testimony might have been.  Without more than Austin's own speculative, hypothetical assertions as to the substance of a medical expert's testimony, the state court reasonably concluded he failed to show a reasonable probability the result of his trial would have been different if defense counsel had retained a medical expert.

The state court's decision to deny Austin's claim was not contrary to, or an unreasonable application of, *Strickland*.   Therefore, Austin is not entitled to federal habeas relief on Ground One.

> **B.    Ground Two:  "Petitioner told counsel that his cellphone records would be exculpatory evidence and that he should get his call and tower records.  Counsel received the records just prior to trial, but did not use them although they were exculpatory."**

Austin provides no additional factual basis for this claim (*see* ECF No. 1 at 6).  He states he presented this claim to the state courts in his Rule 3.850 motion and appeal of the circuit court's decision to the First DCA (*id.* at 7).

The State concedes this claim appears to be exhausted (ECF No. 16 at 10). The State contends the state courts adjudicated the merits of the claim, and Austin has not demonstrated that the adjudication was contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable factual determination (*id.* at 26–29).

1.      Clearly Established Federal Law

The *Strickland* standard governs this claim.

2.      Federal Review of State Court Decision

Austin presented this claim as Ground Two of his Rule 3.850 motion (Ex. D1 at 13–16).   Austin alleged his cellphone records and the cell tower records would have shown he did not have any contact with Tykey Douglas or "anyone else allegedly involved during the time of the murder."   Austin alleged the records also would have shown he "was nowhere near" the scene of the shooting when it occurred from 6:59 p.m. to 7:10 p.m.   Austin alleged the State provided his phone records to defense counsel four days prior to trial.   Austin claimed that if defense counsel had presented his phone records, the jury would have found him not guilty.

The state circuit court adjudicated Ground Two as follows:

> In Defendant's second claim, Defendant asserts that his counsel was ineffective for failing to do an "independent investigation on the Defendant's call detail and cell phone tower records that could have supported counsel's misidentification/alibi defense."   According to Defendant, the records would have shown "that the Defendant hadn't had contact with the victim, Tykey Douglas, or anyone else allegedly involved during the time of the murder, and concrete evidence that the Defendant was nowhere near the scene of the crime when the crime occurred."   Defendant asserts that he asked his counsel multiple times to obtain these records, and provided an explanation of his whereabouts on the day of the crime, but his counsel failed to do so independently, and "procrastinated and simply relied on the State's investigation."

In a previous motion, Defendant indicated that his cell phone was a Samsung Galaxy and his number at the time was 850-356-6750.[FN 10]  The record reveals that the State provided an affidavit and order for disclosure of the records for this number to the defense on January 17, 2013, approximately one month before Defendant's trial.[FN 11] On February 15, 2013, the State provided the call detail phone records for this number to the defense.[FN 12]

> [FN 10:  Attachment 5, motion to produce tangible evidence, filed by Defendant on August 29, 2014.]

> [FN 11:  Attachment 6.]

> [FN 12:  Attachment 6.]

As with Defendant's previous claim, the instant claim is refuted by the record, as Defendant informed the Court at trial that he did not wish to present any further evidence.  Furthermore, even if this were not the case, it does not appear that Defendant has demonstrated deficient performance or prejudice.  Merely receiving the records from the State rather than independently acquiring them does not equate to deficient performance without a showing that counsel could have acquired exculpatory information had he himself investigated more thoroughly and acquired additional records.  Furthermore, Officer Jeffrey Brown testified that he downloaded certain information from Defendant's phone, but that he had not compared it to either Mr. Dortch's [Austin's co-defendant] or Mr. Douglas's [one of the victims] call log.  Additionally, defense counsel argued effectively and without any contrary argument by the State that none of the phone records introduced showed any contact between Defendant and the other individuals involved.  With regard to any tower records, Defendant fails to state specifically in his motion where the tower records would show his phone to be during the relevant time periods.  However, his alibi witness testified that her home (where she testified Defendant was picking her up at approximately the time of the crime) was only about 10 to 15 minutes away from the scene of the shooting.  Consequently, even if the claim were not refuted by the record, it does not appear that

Defendant has shown deficient performance or prejudice.  He is not
entitled to relief on this basis.

(Ex. D2 at 122–23) (footnotes citations to trial transcript omitted).  The First DCA
affirmed the circuit court's decision without written opinion (Ex. D8).

The state court's findings of fact are supported by the state court record (*see*
Ex. D2 at 224–27, 306–12, 353–54, 357–59, 374–80).  As the state court found, the
jury was aware, from Detective Brown's testimony, that Austin's cellphone number
was 850-356-6750.  The jury was also aware that Tykey Douglas' phone records
demonstrated that Douglas did not receive any calls from Austin's phone on the day
of the shooting, and Douglas did not make any calls to Austin's phone that day.

During closing arguments, Austin's counsel argued, without any contrary
argument by the State, that none of the phone records showed any contact between
Austin and Tykey Douglas on the day of the shooting.  The relevant portions of
defense counsel's closing are the following:

> Austin's phone, the phone they have in evidence, they had the
> phone records for Dortch and Douglas's phones in their hands.  I asked
> Thacker, I asked Brown.  I said, "Do you have these phone records?"
>
> We've got affidavits on one two, three, four, five—five different
> numbers, getting the phone records.  I don't mean just, you know, the
> phone and what's on the phone.  I mean, incoming and outgoing calls
> on these phones.  It's in their—it's in their hands fourteen months.  This
> may not have been in their hands fourteen months, but it's been in their
> hands a long time.  It's in their hands.  No evidence.  No physical

evidence that a call was ever made from Mr. Douglas to Mr. Novel Austin, or from Mr. Novel Austin to Mr. Douglas that day or any other day, yet they've had all these records, records of incoming/outgoing. Either no one checked them or, more to the point, there's not a call between Mr. Douglas and Mr. Austin at all that day, that's why we hadn't heard about it.

Now, this is again important as I'm dealing with Officer Thacker, because he admitted he had these records. He gave them off to Brown, Brown had these records, yet no one checked. Or if they did check them, they can't find any record of it. And I'm going to submit to you there is no record of any phone call.

. . . .

Let's get to the lack of evidence.

. . . .

We've all mentioned the phone records. No arguments between, or the call between Mr. Douglas and Mr. Austin.

Mr. Douglas testified that there was, but there was no recordings, even though we have all of these requests by law enforcement, even though we have all of these records that they went through. Nothing. Nothing has been shown to you about a call.

. . . .

Now, the State did enter a couple things into evidence, as far as phone records go. They really didn't have anyone testify about these, but they got entered into evidence. They entered in some entries that were taken from Mr. Novel Austin's property. And basically what it is is [sic] they took his phone, they know his number, obviously, compared everything, and printed out his contact list. . . . [T]hey have these phone numbers. They have them in evidence. They have these phone records to and from.

They are going to say, "Oh, he knew him. His contact was in here." That's what I would imagine they would say in their next closing when they get to rebut. Of course he knows. His contacts are in there. But of all of those phone records that they've gone through, every one of these that they've requested, everyone they got and they gone [sic]

through, including Mr. Dortch's phone records, they can't find one call between Mr. Novel Austin and Mr. Dortch.

So what do they do?  They just submit, well, Mr. Austin has Mr. —or Whoop in his phone address book on his phone.  That should be enough for you.  But they can't find one phone call between them at all.

They submit some phone records that I believe might show you that there were some phone calls between Mr. Dortch and Mr. Douglas that day.  There's another thing they put into evidence because they've gone through all of Mr. Douglas's phone records for that day.  What they haven't submitted to you again is a single record of a single call from Mr. Novel Austin to Mr. Douglas that day.  They have him saying on the stand they've had these records for a long time, this case is 14 months old, but they can't find a single call because it doesn't exist.
. . . .

Could Douglas be mistaken about calls to Austin?

There's no evidence of any calls on his phone records to Mr. Novel Austin.  There's no evidence of any calls from Mr. Novel Austin to Mr. Douglas that day.  Yes, he could be mistaken.  Could he be mistaken about who was really there?

Yes, he could be mistaken.  He already was mistaken twice.

The State also said that there was two separate dealings in this, that he was talking to Mr. Dortch about one deal, he was talking to Mr. Douglas [sic] about another deal.  So don't let me get up here and tell you something about, well, maybe they were, you know, they were on the phone together.  No.

And earlier that day we have testimony that Mr. Novel Austin wasn't even with them, so if there's two separate dealings, if there's two separate calls, it's separate phone dealings, and yet they can't prove it because they don't have it because it doesn't exist.
. . . .

> Officer Thacker got what he wanted. He said, "Oh, he shot him," even though it was the third person, and that's it. They stopped. They didn't check the phone records, or if they did check the phone records, it doesn't back up what he's saying on the stand. DNA, fingerprints, nothing, nothing linking my client to that white SUV.
>
> . . . .
>
> The State is trying to prove this case beyond and to the exclusion of a reasonable doubt. They are trying to prove that Novel Austin is guilty of it, and yet the police don't follow-up on DNA from the SUV, the phone records don't back up their story.

(Ex. B5 at 614–15, 618–23).

The jury knew, from Tykey Douglas' phone records, that there was no contact between Austin's phone and Douglas' phone on the day of the shooting. Therefore, Austin's counsel did not need to introduce Austin's phone records to prove this. To the extent Austin suggests his phone records would have proved he did not have contact with "anyone else allegedly involved during the time of the murder," this evidence would not necessarily have been beneficial to the defense, because the State would surely have argued that the lack of phone communication during the time of the murder made sense because all of the participants were physically together.

Austin alleged records from a cell tower would have shown he "was nowhere near" the scene of the shooting when it occurred from 6:59 p.m. to 7:10 p.m. But as the state court found, Austin did not allege where the cell tower records would have

placed his phone during the relevant time period. Without even a proffer of this evidence, it was not unreasonable for the state court to conclude that Austin failed to show that defense counsel was deficient for failing to present it. Furthermore, defense counsel presented alibi evidence through the testimony of Naomi Sealey, who said Austin picked her up at her house between 7:05–7:20 p.m., which was when the shooting occurred.

Austin failed to demonstrate that the state court's rejection of Ground Two was based upon an unreasonable factual determination, or that it was contrary to or an unreasonable application of *Strickland*. Austin is not entitled to federal habeas relief on Ground Two.

### C.    Ground Three:  "Petitioner named witnesses that [sic] would give an alibi for him, but counsel still didn't even contact the witnesses."

Austin provides no additional factual basis for this claim (*see* ECF No. 1 at 8). He states he presented this claim to the state courts in his Rule 3.850 motion and appeal of the circuit court's decision to the First DCA (*id.* at 8–9).

The State concedes this claim appears to be exhausted (ECF No. 16 at 10–11). The State contends the state courts adjudicated the merits of the claim, and Austin has not demonstrated that the adjudication was contrary to or an unreasonable

application of clearly established federal law, or based upon an unreasonable factual

determination (*id.* at 30–33).

    1. <u>Clearly Established Federal Law</u>

  The *Strickland* standard governs this claim.

    2. <u>Federal Review of State Court Decision</u>

  Austin presented this claim as Ground Three of his Rule 3.850 motion (Ex.

D1 at 16–19).  Austin alleged he told defense counsel that Marquise De'Shawn

Wallace and Kelvin Dewayne Crenshaw were available to testify on his behalf at

trial.  Austin alleged he encouraged defense counsel to contact Wallace soon,

because Wallace "would probably be going to prison."  Austin alleged the following

with respect to the substance of their testimony:

> Both of the witnesses would have testified (proffered) that they
> (Crenshaw and Wallace) were in Attucks Court on December 17, 2011
> around 6:00pm where they saw Dortch and Rogers in a white SUV and
> the Defendant was not with them.  Later, Wallace received a phone call
> from the Defendant, who was complaining about the car that he was
> driving (the way the brakes were bad and the car had no heater during
> late fall).  The Defendant asked Wallace to find him a car in better
> working condition.  Wallace then agreed to meet the Defendant at his
> mother's home at 7:00pm and have someone rent him a car.  When
> Wallace and Crenshaw arrived at 7:05pm, the Defendant was already
> there with Naomi Sealy inside of a gold Chrysler Sebring, which was
> the car with the defective brakes and no heater.  After a short
> conversation between the Defendant and Wallace, a neighborhood drug
> addict by the name of Eddie came by to rent his car (a white
> Oldsmobile) to the Defendant because Wallace had called him for that

particular reason.  The Defendant then gave the keys to the Chrysler Sebring to Wallace.  Then, the Defendant and Naomi Sealy entered the white Oldsmobile and left.  The witnesses (Crenshaw and Wallace) would have testified that the Defendant does not associate with James Dortch or Shaquille Rogers.

(Ex. D1 at 18).  Austin alleged the jury would not have found him guilty if defense counsel had presented Mr. Wallace's and Mr. Crenshaw's testimony.

After accurately describing Austin's claim and his assertions as to the substance of Mr. Wallace's and Mr. Crenshaw's proposed testimony, the state circuit court adjudicated Ground Three as follows:

> Again, the instant claim is refuted by the record, as Defendant informed the Court at trial that he did not wish to present any further evidence, even though he now insists that he did wish to have counsel call these witnesses.  Even were this not the case, it does not appear that Defendant can demonstrate deficient performance or prejudice.

> The shooting in this case occurred about 7 p.m.  State witness Akeiya Mitchell testified that James Dortch and Shaquille Rogers had given her a ride in a white Yukon on the day of the incident at about 3:30 p.m., and the two of them were talking about "wanting to rob somebody."  She stated that Defendant was not with them at the time, and that she had never seen Defendant around James Dortch.   Thus, Ms. Mitchell established that Dortch and Rogers were together in a white SUV at an earlier time in the day.

> Furthermore, counsel did call Naomi Sealey to substantiate Defendant's alibi.  She testified that she received a call from Defendant at 6:18 p.m. on the night of the murder, and that approximately 45 minutes to an hour later, Defendant picked her up at her home and then went to a gas station and to pick up another individual named Tyrie [sic] Sims.  She stated that he was in a white Buick.  It appears that

calling Wallace and Crenshaw to testify that Defendant was at his
mother's home at 7:05 p.m., driving a gold Sebring and with Ms. Sealey
accompanying him, would have conflicted with her testimony. Such
testimony would only have served to undermine the credibility of Ms.
Sealey. Defendant is not entitled to relief on the basis of his third claim.

(Ex. D2 at 124–25) (footnote citations to trial transcript omitted). The First DCA

affirmed the circuit court's decision without written opinion (Ex. D8).

As with Ground One, Austin did not proffer any evidence, in the form of an

affidavit or otherwise, that either potential alibi witness would have testified as

Austin described; instead Austin proffered only his own self-serving description of

Mr. Wallace's and Mr. Crenshaw's proposed testimony. Without more than

Austin's own speculative, hypothetical assertions as to the substance of either

witness's testimony, the state court reasonably concluded he failed to show a

reasonable probability the result of his trial would have been different if defense

counsel had presented testimony from either or both of these witnesses.

Furthermore, Austin admits Mr. Wallace was a convicted felon on his way to

prison at the time of trial. Defense counsel was not deficient for failing to present

testimony from a witness who had an obvious credibility issue. *See* Fla. Stat.

§ 90.610 (providing that a party may attack the credibility of any witness, including

an accused, by evidence that the witness has been convicted of a crime if the crime

was punishable by death or imprisonment in excess of 1 year, or if the crime involved

dishonesty or a false statement regardless of the punishment).  And as the state court found, defense counsel presented testimony from an alibi witness, Naomi Sealey, who did not have that credibility issue.

The state court's rejection of Austin's claim was not based upon an unreasonable factual determination, nor was the decision contrary to or an unreasonable application of *Strickland*.   Therefore, Austin is not entitled to federal habeas relief on Ground Three.

### D.    Ground Four: "Petitioner wanted to testify, but counsel intervened and told Appellant if he testified the prosecutor would impeach him from a rap that he wrote and if he didn't testify he would win."

Austin provides no additional factual basis for this claim (*see* ECF No. 1 at 10).  He states he presented this claim to the state courts in his Rule 3.850 motion and appeal of the circuit court's decision to the First DCA (*id.* at 10–11).

The State concedes this claim appears to be exhausted (ECF No. 16 at 11).  The State contends the state courts adjudicated the merits of the claim, and Austin has not demonstrated that the adjudication was contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable factual determination (*id.* at 34–39).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this claim.

### 2.    Federal Review of State Court Decision

Austin presented this claim as Ground 6 in a "supplement" to his Rule 3.850

motion (Ex. D1 at 76–79).    The state circuit court adjudicated the claim as follows:

> In his sixth claim, Defendant argues that his counsel was ineffective for "misadvising Defendant and lying about [the] results of the proceeding if he testified."    Defendant writes that his counsel told him "that if he testified he would lose [the] trial," and told him that he would be impeached with rap lyrics he had written if he took the stand. He further asserts that counsel told him "if he testified he would surely lose, but if he didn't he would be acquitted."    Thus, Defendant argues his counsel "intimidated" him into his decision not to testify.  Had he taken the stand, Defendant claims, he would have testified that he "was not on the crime scene and he had been in a gold Sebring with a girl named Naomi riding around during the time of the murder.  Defendant would have explained his relationship with both victims and told the jury the last time he had seen them."

> An evidentiary hearing was convened regarding this claim. Defendant testified that he told his counsel that he wanted to testify, but that his attorney told him that the prosecution would make him "look like an idiot," and impeach him with rap lyrics he had written.  He also stated that his attorney told him, "If you don't testify, you're going to win."

> Defendant's trial counsel, Richard Currey, also testified at the hearing.  He stated that he and Defendant had discussed the rap lyrics, and how they could be used to make it appear that Defendant had been writing about the murder.  He said initially that Defendant did not wish to testify, but that during the trial, he changed his mind.  When asked why, Mr. Currey testified, Defendant raised three points to counsel that he wanted to bring out through his testimony.  Mr. Currey testified that they then discussed how each of those points had already been made apparent through the testimony of other witnesses.    He stated emphatically, "I told him my advice; that he should not testify.  I made

no promises, and I never made a promise to anyone in any criminal trial, whether or not if they testified or don't testify, whether or not they would win or lose."

The Court finds the testimony that counsel did not make any promises regarding the trial's outcome to be credible. Further, with regard to counsel's advice regarding potential impeachment, the Court does not find this to be deficient. It appears that counsel simply stated his professional opinions about the potential effect of Defendant's testimony and of the impeachment available to the State. Further, the record demonstrates that Defendant was thoroughly advised by the Court regarding his decision whether to testify. When asked, "Do you understand, Mr. Austin, that the final decision about whether or not to testify I will allow [sic] to be your decision, do you understand that?" Defendant replied, "Yes, sir." The Court asked again, "Your attorney has indicated to me that he believes you want to exercise your right to remain silent and not testify. ls that, in fact, correct?" Defendant responded, "Yes, sir." He affirmatively indicated that it was his decision not to do so. Consequently, the Court does not find that counsel performed deficiently as it pertains to Defendant's choice not to testify. Defendant is not entitled to relief on the basis of his sixth claim.

(Ex. D2 at 127–29) (footnotes citations to trial transcript omitted). The First DCA affirmed the circuit court's decision without written opinion (Ex. D8).

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011); *see also Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference

is heightened on habeas review) (citing *Rice v. Collins*, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")).  Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S. Ct. 843,74 L. Ed. 2d 646 (1983); *see also Smith v. Kemp*, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing.").

Questions of the credibility and demeanor of a witness are questions of fact. *See Consalvo*, 664 F.3d at 845 (citation omitted). "The deference compelled by the AEDPA requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations." *Nejad v. Attorney*, 830 F.3d 1280, 1292 (11th Cir. 2016) (internal quotation marks and citation omitted).  Instead, "[i]n the absence of **clear and convincing evidence**, [courts] have no power on federal habeas review to revisit the state court's credibility determinations." *Id.* (emphasis in original) (citation omitted).

Here, Austin has not presented clear and convincing evidence to rebut the state

court's determination that Attorney Currey provided credible testimony at the post-

conviction evidentiary hearing. Therefore, this federal court must defer to that

determination. Additionally, the transcript of the post-conviction evidentiary

hearing is part of the state court record and supports the state court's factual findings

as to the substance of Austin's and Attorney Currey's testimony at the hearing (Ex.

D4 at 461–83).

With respect to Austin's assertion that Attorney Currey promised him he

would "win" if he did not testify, Attorney Currey flatly denied this:

> I told him my advice, that he should not testify. I made no
> promises, and I never made a promise to anyone in any criminal trial,
> whether or not if they testified or don't testify, whether or not they
> would win or lose.
> . . . .
> I've never told—and I did not tell Mr. Novel Austin that either—
> I've never told anyone if they do this or do that they would be found
> guilty or not guilty.

(Ex. D4 at 471, 473–74). Attorney Currey's credible testimony refutes Austin's

assertion that Currey provided erroneous advice in this regard.

Regarding the rap lyrics, Austin testified that the rap lyrics which Attorney

Currey told him could be used to impeach him were the following, "Little daddy,

little Tony, what's up. I bang with the thugs, you know, and the thugs is really what

they clique." (Ex. D4 at 465–66).  Attorney Currey testified he and Austin discussed the lyrics, and he told Austin that the prosecutor, Ms. Jensen, could use the lyrics to make it appear that Austin was talking about the shooting (*id.* at 470, 474–75).  This was reasonable advice.  At trial, Akeiya Mitchell testified that Keondrick Abrams (the deceased victim) was known as "Daddy."  It was not unreasonable for counsel to be concerned about the prosecutor's questioning Austin about his associating the deceased victim with "banging with the thugs" in his rap lyric.

Attorney Currey testified there were additional reasons he advised Austin not to testify, namely, Austin's self-described "stage fright, nervousness," and the fact that the jury heard, through other witnesses, all of the facts to which Austin wished to testify.  Attorney Currey stated:

> . . . before the trial, we talked about it, in which Mr. Austin said he didn't feel like he was going to testify because, as he said, stage fright, nervousness.  He said he tended to stutter during that time when he would get nervous.
>
> Either around the beginning of the trial or the day before the trial, we talked about the rap lyrics.  It wasn't a thing during the trial, but we talked about that, and how it could be used to make him appear to be talking about this incident by Ms. Jensen [the prosecutor].
>
> During the trial, right before we got to the middle, he mentioned he thought he wanted—he should testify, which was a change of what he said before.  And I asked him, Why do you think you should testify?  What are—you're going to get out [sic].  And there was three grounds he thought he would get out.

And we went through those and talked about why those had already been made apparent in the trial through the testimony of other people.  So, therefore, if his testimony was not going to add anything to it, if it was just to keep the status quo, then that was the best he could do.  The worst he could do would be do something that would let Ms. Jensen make him look more culpable to this through other ways.

. . . .

We went over the specific concerns of his, about what—what needs to come out.

. . . .

The concerns were, I believe, specifically about whether or not he and the victim were friends.

And we talked about how both—two other witnesses talked about how he and the victim were friends.  Two other witnesses, including the victim that survived, talked about how they had never seen him with his codefendant, which was another issue he wanted to bring out.

And as far as where he was, an alibi at the time, we had Ms. Seally [sic], who was subpoenaed, did testify as an alibi witness, and provide times for his location during the night in question.

. . . .

[I]t came out in testimony at trial that Ms. Seally [sic] received a call from the defendant at 6:15; 45 minutes to an hour later is when he picked her up.

They drove around for a little bit, and then at 8:59, they were on video at a McDonalds, I believe, and, therefore, she also testified that from where she was picked up, 45 minutes to an hour later, it would take 10 to 15 minutes to get to the scene of where this incident—this murder had occurred.

It was part of my closing, and a large part of my closing, that the timeline that she provides—and she also said she was not that good of a friend with him, this was the first time they were riding together; it

wasn't like she was dating him or was biased, anything like that—but the timeline she provided that we brought out at trial was that from the time he called her and picked her up, when she was getting in that car with him, would have been around the same time this incident occurred, and it was impossible for that to occur.

That was part of our case. And that is what she testified to in trial.

(Ex. D4 at 470–73). Austin's nervousness and possible stuttering, which a juror could infer as indicating untruthfulness and/or culpability, and the fact that other witnesses testified to essentially the same facts that Austin intended to relay, were sound reasons for Attorney Currey's advising Austin against testifying.

The state court reasonably concluded Austin failed to show that Attorney Currey performed deficiently in any respect when advising Austin regarding his right to testify. Austin failed to show that the state court's rejection of Ground Four was based upon an unreasonable factual determination, or that it was contrary to or an unreasonable application of *Strickland*. Therefore, Austin is not entitled to federal habeas relief on Ground Four.

**E.    Ground Five: "If trial counsel would have called a medical expert to testify to the adverse affect [sic] that the gunshot wound had on victim's memory, discussed the exculpatory cellphone records, called Defendant's alibi witnesses, and had counsel advised Defendant properly, Defendant would have more than likely gotten [sic] acquitted."**

Austin claims that the cumulative effect of the errors of defense counsel described in Grounds One through Four *supra* caused him to be convicted (*see* ECF No. 1 at 16).  The State did not address this claim in its answer (*see* ECF No. 16).

Austin presented a "cumulative error" claim as "Supplemental Ground 7" of his Rule 3.850 motion (Ex. D1 at 108–12).  The state circuit court adjudicated the claim as follow:

> In his seventh and final claim, Defendant raises a claim of cumulative error.  Because the Court has found no merit in the preceding claims, his final claim must also fail.  Defendant is not entitled to relief under a theory of cumulative error.

(Ex. D2 at 12).  The First DCA affirmed the decision without comment (Ex. D8).

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated: "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim."  *Forrest v. Fla. Dep't of Corr.*, 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but recognized as persuasive authority).  The *Forrest* panel further noted "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'"  *Id.* at 564–65

(quoting *United States v. Cronic*, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L .Ed. 2d 657 (1984)).

Considering *Cronic* and the absence of Supreme Court precedent applying the "cumulative error" doctrine to claims of ineffective assistance of counsel, the state court's rejection of Austin's claim is not contrary to or an unreasonable application of clearly established federal law. *See Wright v. Van Patten*, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).

Moreover, as previously discussed, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic*, 466 U.S. at 659 n.26. Where there is no actual error, the "cumulative error" claim has no merit. *See Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) (citing *Morris*, 677 F.3d at 1132).

As discussed *supra*, Austin failed to show any constitutional error with respect to defense counsel's assistance. In the absence of any actual error, Austin's "cumulative error" claim has no merit.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v.*

*Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting

§ 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has

shown that 'jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further.'"  *Buck v. Davis*, 580 U.S.—, 137 S.

Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327).  The

petitioner here cannot make that showing.  Therefore, the undersigned recommends

that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order,

the court may direct the parties to submit arguments on whether a certificate should

issue."  Thus, if there is an objection to this recommendation by either party, that

party may bring this argument to the attention of the district judge in the objections

permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 2nd day of April 2020.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

# <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**